No. 14-55583

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF SANTA MONICA,

*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA, FEDERAL AVIATION ADMINISTRATION, and
MICHAEL P. HUERTA, in his official capacity as
Administrator of the Federal Aviation Administration,

*Defendants-Appellees.*

Appeal from the United States District Court for the Central District of California,
Hon. John F. Walter (Case No. CV 13-8046-JFW (VBKx))

## REPLY BRIEF FOR PLAINTIFF-APPELLANT
## CITY OF SANTA MONICA

MARSHA JONES MOUTRIE
  *City Attorney*
JOSEPH LAWRENCE
  *Assistant City Attorney*
LANCE S. GAMS
IVAN CAMPBELL
  *Deputy City Attorneys*
1685 Main Street, Room 310
Santa Monica, California  90401-3295
Telephone:  310.458.8336

DEANNE E. MAYNARD
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, Suite 6000
Washington, D.C.  20006-1888
Telephone:  202.887.8740

DON G. RUSHING
JAMES W. HUSTON
WILLIAM V. O'CONNOR, JR.
JOANNA L. SIMON
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California  92130-2040
Telephone:  858.720.5100

*Counsel for Plaintiff-Appellant City of Santa Monica*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ...............................................................................................1

ARGUMENT ......................................................................................................5

    A.    The 1948 Instrument Of Transfer Did Not Provide Notice That The United States Claimed An Interest In The Title To (Or Perpetual Possession Of) The City's Land..........................................5

        1.    The reverter clause did not give the United States a claim to the title to the City's Land .......................................................5

        2.    Any ambiguity in the reverter clause precludes it from triggering the statute of limitations...........................................11

        3.    The United States has now abandoned its argument that recordation of the Instrument of Transfer provided notice of the United States' claim to title to the City's Land .............12

        4.    The reverter clause does not create a cloud on the title............12

        5.    The City's conduct after entering into the Instrument of Transfer does not show that the City had notice of a dispute over the title to the City's Land....................................14

    B.    Even If The Instrument Of Transfer Provided Notice Of The United States' Claim, The United States Later Repeatedly Disclaimed Its Interest, And A New Cause Of Action Accrued In 2008..............................................................................................20

    C.    Whether The City's Quiet Title Act Claim Is Time Barred Depends On Factual Issues Going To The Merits .............................26

CONCLUSION ..................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Augustine v. United States*,
704 F.2d 1074 (9th Cir. 1983) ....................................................26, 27

*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*,
289 F.3d 589 (9th Cir. 2002) ...........................................................18

*Block v. North Dakota*,
461 U.S. 273 (1983).........................................................................27

*Citizens for Covenant Compliance v. Anderson*,
906 P.2d 1314 (Cal. 1995) ...............................................................10

*Comedy Club, Inc. v. Improv W. Assocs.*,
553 F.3d 1277 (9th Cir. 2009) .........................................................11

*Kingman Reef Atoll Invs., LLC v. United States*,
541 F.3d 1189 (9th Cir. 2008) ...............................................24, 25, 26

*Kinscherff v. United States*,
586 F.2d 159 (10th Cir. 1978) (per curiam) ......................................13

*Leisnoi, Inc. v. United States* ("*Leisnoi I*"),
170 F.3d 1188 (9th Cir. 1999) ...........................................5, 13, 17, 21

*Leisnoi, Inc. v. United States* ("*Leisnoi II*"),
267 F.3d 1019 (9th Cir. 2001) ......................................................5, 13

*Long Beach Area Chamber of Commerce v. City of Long Beach*,
603 F.3d 684 (9th Cir. 2010) ............................................................18

*McFarland v. Norton*,
425 F.3d 724 (9th Cir. 2005) ............................................................13

*Michel v. United States*,
65 F.3d 130 (9th Cir. 1995) (per curiam) ....................................*passim*

*Narramore v. United States*,
  852 F.2d 485 (9th Cir. 1988) ...............................................................13

*Patterson v. Buffalo Nat'l River*,
  76 F.3d 221 (8th Cir. 1996) ............................................................5, 11

*Poverty Flats Land & Cattle Co. v. United States*,
  706 F.2d 1078 (10th Cir. 1983) .........................................................11

*Santa Monica Aiprort Ass'n v. City of Santa Monica*,
  No. 16-99-21, 2003 WL 1963858 (FAA Feb. 4, 2003).....................25

*Shultz v. Department of Army*,
  886 F.2d 1157 (9th Cir. 1989) .....................................................*passim*

*Werner v. United States*,
  9 F.3d 1514 (11th Cir. 1993) ..............................................................13

**STATUTES**

Amendment to Surplus Property Act of 1944, Pub. L. No. 80-289, 61 Stat.
  678 (1947)...........................................................................................7

Surplus Property Act of 1944, Pub. L. No. 78-457, 58 Stat. 765 (1944) .................8

## INTRODUCTION

The City of Santa Monica ("the City") explained in detail in its opening brief how nothing in the 1948 Instrument of Transfer's reverter clause could have given the City notice that in 2008 the United States would assert a claim to the title to (or perpetual possession of) the two tracts of land at issue here ("the City's Land"). Lacking any real response, the United States completely ignores most of the City's arguments. Instead, the United States largely just repeats the district court's conclusions, without actually engaging with the language of the agreements. The United States' inability to offer any reasoned defense of the district court's decision is telling: the decision cannot be squared with the language of the agreements and the governing law.

As the City explained, at all relevant times, the City owned the City's Land in fee simple. The City only temporarily leased the City's Land to the United States at nearly no cost to aid in the United States' war effort. At the end of the lease terms, the United States was obligated to remove any improvements it had made to the City's Land. The United States determined that it did not need the City's Land during the then-remaining portion of the limited-term leases and decided to surrender the leases early. The City agreed to allow the United States to do so and to leave the United States' improvements on the City's Land, relieving the United States of its obligation to restore the land to its pre-lease condition. The

United States conveyed to the City the remaining duration of its temporary leases, its improvements, and certain easements and chattel to be used for airport purposes. The surrendered leases expired by their terms in 1953. The transferred assets have no remaining useful value. None of this is in dispute.

The United States now asserts that its surrender of a temporary leasehold somehow gave it *broader* rights to the City's Land than it ever had to begin with, namely, a claim to the *title* to, or perpetual possession of, the City's Land. Even more extraordinary than its new claim, the United States also asserts, and the district court held, that the City knew or should have known *in 1948* that the United States would assert such a claim and that the City's Quiet Title Act claim is therefore time barred. But as the City explained, there was no dispute in 1948 over the title to, or perpetual possession of, the City's Land. Any suit at that time would have been premature, unnecessary, and potentially pointless.

Relying on the text of the Instrument of Transfer, the City explained in its opening brief that nothing in the reverter clause could be construed as applying to the title to (or perpetual possession of) the City's Land. By its terms, the reverter clause applied only to "rights transferred by this instrument." ER352. Thus, the only interests that could have reverted to the United States are the interests that the United States conveyed to the City in the Instrument of Transfer itself. That does not include title to the City's Land, as it is undisputed that the City held the title in

fee simple throughout the period of the leases and at the time of the Instrument of Transfer. Nor does it include the right of perpetual possession, as the United States conveyed only the remainder of its temporary, now-expired leases. The United States has no response to this argument.

The City also explained in its opening brief that the plain meaning of "revert" supports this reading. The plain and ordinary meaning of "revert" involves returning previously held property interests to the former owner of such interests. Under this meaning, neither the title to the City's Land nor the right of perpetual possession could revert to the United States because the United States never had those rights. Again, the United States does not even attempt a response.

Nor does the United States try to refute the City's argument that this reading is confirmed by the Surplus Property Act, pursuant to which the Instrument of Transfer was entered into. The Surplus Property Act required that reverter clauses provide that if the conditions in an instrument of transfer are not met, the "property so disposed of" in the instrument shall revert to the United States. Title to and right of perpetual possession of the City's Land were not "disposed of" in the Instrument of Transfer, and therefore the reverter clause could not have applied to them.

The United States also fails to challenge the City's argument that the City's interpretation is, at the very least, plausible. Because the reverter clause is at best

3

ambiguous, the City could not have had sufficient notice of the United States' claim. This unrefuted contention is alone enough to reverse the district court's dismissal of the City's claim.

Moreover, even setting aside the meaning of the 1948 reverter clause, there is an independent basis to reverse. The United States and the City entered into a Settlement Agreement in 1984, which released the City from the Instrument of Transfer's obligations. The Director of the Federal Aviation Administration ("FAA") concluded in a formal Director's Determination in 1998 that in light of the 1984 Settlement Agreement, the City is not obligated to maintain the Santa Monica Municipal Airport ("Airport") after July 1, 2015. These documents gave the City reason to believe that the United States did not claim any interest in the title to, or perpetual possession of, the City's Land. When the United States reversed itself in 2008, it gave rise to a new claim and started a new twelve-year limitations period. The City timely brought suit within 12 years thereafter.

In any event, these issues go not only to the City's notice but also to the underlying merits of the City's Quiet Title Act claim. Both the notice issue and the merits issue depend on the interpretation of the Instrument of Transfer and the 1984 Settlement Agreement. That basis alone precludes dismissal on jurisdictional grounds.

The dismissal of the City's Quiet Title Act claim as time barred should be reversed, and the case should be remanded for consideration of the merits of the City's claim.

## ARGUMENT

**A.** **The 1948 Instrument Of Transfer Did Not Provide Notice That The United States Claimed An Interest In The Title To (Or Perpetual Possession Of) The City's Land**

### *1.* *The reverter clause did not give the United States a claim to the title to the City's Land*

As the City explained (City Br. 31-32), to start the running of the statute of limitations on a Quiet Title Act claim, the plaintiff must have notice not only that the United States asserts some claim to the property at issue but also that the United States' claim is "adverse to the claim asserted by the [plaintiff]." *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995) (per curiam); *see Leisnoi, Inc. v. United States* ("*Leisnoi II*"), 267 F.3d 1019, 1025 (9th Cir. 2001); *Patterson v. Buffalo Nat'l River*, 76 F.3d 221, 224 (8th Cir. 1996). In other words, not only must the United States "claim an interest in the property at issue," there also "must be a disputed title to real property." *Leisnoi, Inc. v. United States* ("*Leisnoi I*"), 170 F.3d 1188, 1191 (9th Cir. 1999).

The United States appears to agree that this is the correct standard. U.S. Br. 15 (contending that "the City knew or should have known that the United States claimed an interest in the Airport Property *adverse to* the City's" (emphasis

5

added)). The sole document on which the United States relies as purportedly providing notice that the United States claimed an interest in the City's Land adverse to the City's interest is the 1948 Instrument of Transfer. *Id.* at 15-16.

But as the City explained in great detail—in discussions the United States completely ignores—the Instrument of Transfer provided no notice of any dispute over the title to the City's Land. City Br. 32-40. Nor did it provide notice that the United States would claim a right to retake possession of the City's Land decades after the United States' temporary leasehold interests expired. *Id.* Rather, in the Instrument of Transfer, the United States simply surrendered back to the City the United States' now-expired leasehold interest in the City's Land and conveyed to the City certain now-valueless easements, improvements, and chattel. *Id.* at 11-13, 32-33. The reverter clause provided only that the specific property interests transferred in the Instrument of Transfer—the now-expired leasehold interests and the now-valueless easements, improvements, and chattel—could revert to the United States if the City stopped using them for airport purposes. *Id.* at 33-37. Nothing in the reverter clause suggested that the United States had any claim to the title to the City's Land or to possess the City's Land once the temporary leasehold interests expired.

The United States simply repeats the district court's conclusion that the "'use of the term "title" in the Instrument of Transfer would have, or at least

6

should have, alerted a reasonable landowner that the government claimed an interest in title to the land.'" U.S. Br. 16 (quoting ER11). But the United States provides no reasoned defense of that conclusion and fails even to grapple with the City's points refuting it.

Specifically, the United States does not (and cannot) contest that the reverter clause applied only to the specific "rights transferred by this instrument," ER352, which did not include title to the City's Land. As the United States does not dispute, it has *never* owned the title to the City's Land. Nor does the United States challenge that the plain and ordinary meaning of "revert" encompasses only previously held property interests being returned to the former owner of such interests. City Br. 34-35 (citing dictionaries).

The United States likewise does not challenge that this reading is confirmed by the Surplus Property Act, "under and pursuant to" which the Instrument of Transfer was entered into. ER347. The Surplus Property Act provided that reverter clauses would apply to "property so disposed of" in the Instrument of Transfer." Pub. L. No. 80-289, sec. 2, § 13(g)(2)(H), 61 Stat. 678, 680 (1947). "Property" was defined as property that had been "owned by the United States."

Surplus Property Act of 1944, Pub. L. No. 78-457, § 3(d), 58 Stat. 765, 767 (1944).[1]

Similarly, the FAA's Airport Compliance Manual provides that reverter clauses apply "only to the title, right of possession, or other rights vested in the United States at the time the federal government transferred the property described in the instrument to the grantee." ER107.[2]

The United States never even tries to take on these arguments, presumably because it has no defense of any other reading. Under the plain language of the Instrument of Transfer, the word "title" in the reverter clause refers only to any "title . . . transferred by this instrument." ER352. Under that plain reading, the

---

[1] Amici Aircraft Owners and Pilots Association and National Business Aviation Association (collectively, "AOPA") discuss the history and purpose of the Surplus Property Act and Congress's intent to foster the development of a national aviation system. AOPA Br. 1-4. Nothing in this discussion suggests that the Surplus Property Act was ever intended to allow the United States to retake *more* than what it conveyed under the Act. Nor are the arguments about the alleged implications on air traffic (*id.* at 5-9) at issue here. The sole issue in this appeal is whether in 1948 the City had notice of the United States' claim to take title to (or perpetual possession of) the City's Land. Even if the alleged impact on air traffic were relevant (it is not), there is no evidence in the record on this issue, as the district court dismissed the City's complaint on jurisdictional grounds before any such evidence could have been developed.

[2] The United States does not defend the district court's decision to discount the 2009 version of the FAA Airport Compliance Manual included in the City's opposition to the motion to dismiss. *See* ER11 n.5. As the City explained (and the United States does not contest), the FAA's Airport Compliance Manual has included this guidance for at least 20 years and is consistent with a 1947 regulation promulgated by the FAA's predecessor. City Br. 38.

only title that possibly could have reverted to the United States was title to the improvements and certain specific chattel on the City's Land that was transferred in the Instrument of Transfer. ER302-ER303; ER349, ER354; *see* ER209 (1947 War Assets Administration letter observing that "title to the improvements and facilities" would be transferred to the City). As the United States does not contest, none of those assets has any remaining useful value. Because title to the City's Land was not (and could not have been) transferred by the Instrument of Transfer, the reverter clause gave the City no notice that the United States would claim, decades later, that title to the City's Land could somehow "revert" to the United States under that document. *Michel*, 65 F.3d at 132.

The only interest in the City's Land that ever could have reverted was the United States' temporary leasehold interest, which could have occurred only during the life of the limited-term leases. Those leases expired in 1953, and thus there is no interest in the City's Land left to revert. The United States has no answer to that either.

Although the district court did not rely on this language, the United States points to the phrase "run with the land" in the Instrument of Transfer. U.S. Br. 16; *see* ER350. But the United States does not and cannot explain how this phrase could have provided the City notice that the United States claimed an interest in the *title* to the City's Land. A covenant that runs with the land "binds not only the

9

person who entered into it, but also later owners and assigns who did not personally enter into it." *Citizens for Covenant Compliance v. Anderson*, 906 P.2d 1314, 1318 (Cal. 1995). The only pertinent provision in the Instrument of Transfer that runs with the land is the requirement that "the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes." ER350. Like the reverter clause, that restriction is likewise limited to the interests conveyed by the United States in the Instrument of Transfer, namely, the now-expired leasehold interests and the now-valueless easements, improvements, and chattel. ER350, ER352. Thus, the plain meaning of that clause is that if the City had parted with those conveyed interests, the new owner would have to use them "for public airport purposes." ER350; *see Citizens for Covenant Compliance*, 906 P.2d at 1318. It does not mean, as the United States suggests, that *the City's Land*—which the United States never owned and did not convey in the Instrument of Transfer—must forever be used for "public airport purposes."

In any event, even if the "run[s] with the land" provision could be read as creating that extraordinary obligation (and it cannot), that still would provide no notice about the separate question of the remedy if the obligation were not fulfilled. It is that separate question that is at the heart of the statute-of-limitations inquiry here: the meaning of the reverter clause. The plain language of that clause

10

provided no notice that the United States believed it could take title to (or possession of) the City's Land long after the surrendered, temporary leases expired.

In short, nothing in the Instrument of Transfer is inconsistent with the City's understanding that the reverter clause applied only to the specific interests being transferred in the Instrument of Transfer, all of which have expired or exceeded their useful life. Vastly differently language would have been required to provide the City with notice that the United States would claim that the reverter clause somehow gave the United States far greater rights than it ever had before.

### 2. *Any ambiguity in the reverter clause precludes it from triggering the statute of limitations*

As the City also explained, even if the word "title" in the reverter clause could be read to extend to title to the City's Land, the City's reading is at least as plausible as the district court's. City Br. 40-41. Thus, even if the district court's reading were plausible (it is not), it would make the reverter clause at best ambiguous. *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1285 (9th Cir. 2009). But an ambiguous contractual provision cannot provide notice sufficient to begin the limitations period under the Quiet Title Act. *Shultz v. Department of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989); *Poverty Flats Land & Cattle Co. v. United States*, 706 F.2d 1078, 1079 (10th Cir. 1983); *Patterson*, 76 F.3d at 224. The United States does not contest this at all: it neither contends that

11

the district court's reading is the only plausible one nor disputes the governing legal principles. This alone is an unrefuted basis to reverse.

> **3.**   **The United States has now abandoned its argument that recordation of the Instrument of Transfer provided notice of the United States' claim to title to the City's Land**

The district court accepted the United States' argument that "the City had constructive notice of the United States' reversionary interest in the title to the land because the Instrument of Transfer was recorded as a quitclaim deed with the County Recorder for the County of Los Angeles in 1948." ER10; *see* ER156-ER157. As the City explained, merely recording an instrument as a quitclaim deed does not suggest that title to real property is involved; rather, a quitclaim deed (as the name implies) simply reflects a termination of a claim to an interest, and that interest can be less than fee simple. City Br. 41-43. Faced with the City's refutation of its recordation argument, the United States has now abandoned it.

> **4.**   **The reverter clause does not create a cloud on the title**

The United States also repeats the district court's conclusion that "'even if the Instrument of Transfer did not provide notice that the United States claim[ed] an interest in the *title* to the land, it certainly put the City on notice that the United States claimed a substantial property interest in the land sufficient to create a cloud on title.'" U.S. Br. 16 (emphasis in original) (quoting ER11). Beyond merely

restating this conclusion, the United States has no explanation for how it could be correct.

It is not. As the City explained (City Br. 43-46), and the United States does not refute, a "clouded" title is created only when the United States claims an "adverse interest" to the plaintiff's claimed interest. *Leisnoi II*, 267 F.3d at 1025. When the United States and a plaintiff claim potentially consistent interests in the same property, a Quiet Title Act cause of action accrues only "when the government, 'adversely to the interests of plaintiff[], denie[s] or limit[s]'" the plaintiff's claimed interest. *Michel*, 65 F.3d at 132 (quoting *Werner v. United States*, 9 F.3d 1514, 1516 (11th Cir. 1993)). Thus, even if the United States and the plaintiff both openly claim a substantial property interest in the same land, that alone does not start the statute of limitations unless the claimed property interests conflict. *See Shultz*, 886 F.2d at 1160-61; *McFarland v. Norton*, 425 F.3d 724, 727-28 (9th Cir. 2005); *Leisnoi I*, 170 F.3d at 1191-92; *Michel*, 65 F.3d at 132; *Narramore v. United States*, 852 F.2d 485, 492 (9th Cir. 1988); *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978) (per curiam).

Here, the United States' contingent reversionary interests in the now-expired leases and in the now-valueless easements, improvements, and chattel were entirely consistent with the City's title. That the United States had those contingent interests did not cast any doubt on the City's full retention of its

13

ownership of the City's Land in fee simple. Nor did it suggest that the United States could take possession of the City's Land even after the United States' leases expired by their terms. The United States does not contest any of this. Its bare restatement of the district court's erroneous conclusion is insufficient to sustain it.

**5.    *The City's conduct after entering into the Instrument of Transfer does not show that the City had notice of a dispute over the title to the City's Land***

The sole argument that the United States makes in any sort of developed fashion is that "'the City's statements and conduct since 1953'" show that the Instrument of Transfer gave the City notice of the United States' claim. U.S. Br. 17 (quoting ER12 n.7). Like the district court, the United States points to the 1952 and 1956 releases from the Instrument of Transfer's restrictions on the use of the City's Land, the City Attorney's 1962 Opinion, and the 1984 Settlement Agreement. *Id.* at 17-18; ER11-ER12 & n.6. The United States also points to a 1975 Opinion by the Attorney General of California. U.S. Br. 18. But as the City explained (City Br. 46-48), none of these documents shows there was any dispute over either the title to the City's Land or the City's unencumbered right to possess the City's Land after expiration of the leases.

The United States does not address the 1952 and 1956 releases in any detail. U.S. Br. 17. For good reason: nothing in those documents is plausibly inconsistent with the City's position here. The 1952 release was entered into at a

14

time when the surrendered leases had not yet expired (which occurred in 1953), ER300; that release therefore precluded those then-unexpired leasehold interests from reverting to the United States for their remaining term. The 1956 release was necessary to preclude reverter of the easements, improvements, and chattel transferred in the Instrument of Transfer. As the City explained (City Br. 47), neither the 1952 release nor the 1956 release was necessary to preclude *title* to the City's Land from reverting to the United States, and nothing in those documents indicates that the City thought otherwise. The United States has no response.

With respect to the City Attorney's 1962 Opinion, the City Attorney concluded that under two sets of obligations—the Instrument of Transfer *and* several then-in-force grant agreements with the FAA—the City could not "unilaterally, on motion of the City Council, abandon the use of the Santa Monica Municipal Airport as an airport." ER173; *see* ER176-ER182. The Opinion quoted extensively not only from the Instrument of Transfer but also from the grant agreements to conclude that the City still had an obligation at that time to maintain Airport operations. ER176-ER181. His Opinion expressly confirms the City's understanding that in the Instrument of Transfer, the United States only "surrendered its leasehold interest in the Airport and assigned to the City certain easements, structures, improvements, and chattels." ER176. Although the leases had expired by that time, it is likely that not all of the other conveyed interests had

15

yet exceeded their useful life, and therefore the City's rights to those specific interests were still at stake. Nothing in the City Attorney's Opinion suggests that, if the City ever ceased operating the Airport, title to or right of possession of the *City's Land* could "revert" to the United States under the Instrument of Transfer's reverter clause.

The same is true of the 1975 Opinion of the Attorney General. The Attorney General concluded only that "[t]he City of Santa Monica, at the present time, may not cease using the Santa Monica Municipal Airport for airport purposes." ER184. The Attorney General based that conclusion on both the Instrument of Transfer *and* numerous grant agreements. ER187-ER189. With respect to the Instrument of Transfer, the Attorney General stated only that it "provided that the surrender to the City was subject to certain reservations, restrictions, conditions and covenants as thereafter set forth, and that the same shall run with the land." ER189. His opinion did not even mention the reverter clause, much less suggest that the United States claimed any interest in the title to, or right of perpetual possession of, the City's Land. ER187-ER189.

The 1984 Settlement Agreement also is consistent with the City's position. The 1984 Settlement Agreement released the City from the "conditions, covenants, and restrictions imposed by the Instrument of Transfer." ER371. That agreement expressly allowed the City, inter alia, to pursue "modify[ing] the existing runway"

16

(ER375), even though the runway had been improved by the United States (ER318, ER322-ER323), and the improvements had been conveyed in the Instrument of Transfer (ER349). Without this release, the runway modifications might have been construed as violating obligations in the Instrument of Transfer and might have implicated the reverter clause with respect to the runway improvements. Nothing in the 1984 Settlement Agreement suggests that title to (or right of perpetual possession of) the City's Land could "revert" to the United States under the Instrument of Transfer.

Indeed, it is telling how the United States describes the notice provided by the City Attorney's Opinion, the California Attorney General's Opinion, and the 1984 Settlement Agreement. The most that the United States says in characterizing these agreements is that they show that the City purportedly knew "that the United States claimed *an interest* in the land." U.S. Br. 17 (emphasis added). But that argument about some unnamed "interest" suffers from the same defect as the district court's decision: it fails to explain how these documents purportedly gave the City notice that there was any conflict over the specific interests at stake here—title to or right of perpetual possession of the City's Land. Without notice of a conflict or dispute over those specific interests, there was no basis for the City to bring a Quiet Title Act claim based on the Instrument of Transfer itself. *Leisnoi I*, 170 F.3d at 1192.

17

In light of the weakness of the statements relied on by the district court and the United States, amici AOPA try to inject into this appeal new evidence that was not introduced in the district court and is thus not part of the record on appeal. *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 593-94 (9th Cir. 2002). According to AOPA, a former Assistant City Attorney, Stephen Stark, gave testimony in unrelated matters in 2001 and 2003 that purportedly "establish[es] that the City in fact was aware of the Federal government's interpretation of the 1948 Instrument of Transfer more than twelve years before the complaint was filed." AOPA Br. 11. This Court should not entertain AOPA's evidentiary submission. *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 698 (9th Cir. 2010) (rejecting amicus's "attempts to bolster" an appeal by offering texts of city ordinances and two reports). The "district court was the appropriate forum in which to introduce this 'evidence.'" *Id.*

In any event, the testimony cited by AOPA came from lawsuits in which title to the City's Land was not at issue, and it does not show that the City had notice that the United States claimed that the City's Land could somehow "revert" to the United States, even though the United States never had such title. As an initial matter, Mr. Stark's employment as Assistant City Attorney with the City ended in 1985, more than 15 years before his 2001 and 2003 testimony. AOPA Br. Ex. A at 2. Mr. Stark's own personal thoughts and recollections about the

provisions of the Instrument of Transfer long after he was no longer a City employee cannot show that the City had notice of his thoughts.

Nor does the content of his testimony suggest that either he or the City knew the United States claimed an interest in the title to (or the right to perpetual possession of) the City's Land. In the 2001 transcript, Mr. Stark was asked about a paragraph in the Instrument of Transfer: "And the last full paragraph, I will sum this up quickly, is that basically if the city ever in perpetuity ever tries to convert any of *this property* to any other use, then the federal government gets it back, or can operate to get it back at that time?" *Id.* at 35 (emphasis added). Mr. Stark answered: "I think that's a reasonable plane [sic] English statement of what that purports to say." *Id.* But the critical issue is what "this property" in the question means. In context, it refers to the property mentioned in the reverter clause, i.e., the rights transferred in the Instrument of Transfer—which does not include title to the City's Land. That is consistent with the discussion immediately preceding this question, which is about a runway (an improvement) that the United States built at the Airport. *Id.* at 34. At no point was Mr. Stark asked about title to (or even the right to possess) the City's Land.

At the later 2003 hearing, Mr. Stark was asked only whether the Instrument of Transfer imposed a "covenant and restriction that ran with the land, that the land *subject to this deed* be used as an airport in perpetuity." *Id.*, Ex. B at 337

19

(emphasis added).  Mr. Stark responded:  "I understand that that's what it said."
*Id.*  But the only property interests "subject to" the Instrument of Transfer were the
remaining duration of the temporary leases and the specific easements,
improvements, and chattel conveyed in the document.  Mr. Stark did not suggest
that the obligation applied to any other property interests.  He also testified that
"there was some controversy" concerning whether even that obligation was
enforceable in perpetuity.  *Id.*  In any event, the reverter clause was not discussed
at that hearing.  Mr. Stark never gave any testimony suggesting whether the scope
of the reverter clause extended beyond the property interests conveyed in the
Instrument of Transfer to include title to the City's Land.

**B.     Even If The Instrument Of Transfer Provided Notice Of The United
       States' Claim, The United States Later Repeatedly Disclaimed Its
       Interest, And A New Cause Of Action Accrued In 2008**

Even if the Instrument of Transfer somehow gave the City notice of the
United States' claim to the title to the City's Land and triggered the statute of
limitations in 1948, the United States' actions thereafter gave the City ample
"reason to believe the government did not continue to claim" that interest.  *Shultz*,
886 F.2d at 1161.  Specifically, in the 1984 Settlement Agreement, the United
States permanently released the City from the Instrument of Transfer's
requirements in exchange for a new 30-year obligation to operate the Airport under
new boundaries adopted in the Settlement Agreement.  City Br. 19-21, 51; ER371-

ER373.  And in 1998, the FAA Director confirmed that this release meant that the City is obligated to maintain Airport operations only until 2015.  City Br. 21-22, 51-52; ER294-ER295.

These documents settled the ongoing rights and obligations of the City and the United States and therefore stopped the running of the 12-year limitations period.  *Michel*, 65 F.3d at 133; *Shultz*, 886 F.2d at 1161.  Indeed, the City could not have brought a Quiet Title Act claim at that point because there was no longer any "dispute" over the City's Land.  *Leisnoi I*, 170 F.3d at 1193.  A new claim accrued in 2008, when the United States asserted, contrary to its prior statements, that the title to the City's Land could "revert" to the United States under the Instrument of Transfer.  *Shultz*, 886 F.2d at 1161.  This lawsuit is timely because the City brought suit within 12 years from 2008.  City Br. 49-53.[3]

The United States tries to limit the scope of the release that it agreed to in the 1984 Settlement Agreement, claiming that the release applied only to "a

---

[3] Amici AOPA (but not the United States) asserts that "this specific argument was not raised by the City in response to the Federal government's motion to dismiss" and therefore "has been waived."  AOPA Br. 13-14.  That is plainly incorrect.  ER72-ER75.  A four-page section of the City's opposition below asserted that "[t]he 1971 Letter, 1984 Agreement, and Subsequent FAA Assertions Constitute Abandonment of Defendants' Claim" and that "[o]nly when Defendants (re)asserted [their] position in 2008 did the clock (re)start for purposes of the [Quiet Title Act's] 12-year statute of limitations."  ER72, ER75.  Indeed, that the district court addressed this argument (ER12-ER13) demonstrates it was raised below.

21

specified parcel of land." U.S. Br. 20. But as accurately quoted in the City's brief—which did not "omit[]" any provisions, contrary to the United States' suggestion, *id.* at 20—the Settlement Agreement "release[d] *the City* and this parkland and residual land from any and all conditions, covenants, and restrictions imposed by the Instrument of Transfer." City Br. 51 (alteration and emphasis in City's brief) (quoting ER371). The United States tries to ignore the phrase "the City and" in the release, to make the release apply only to "this parkland and residual land." U.S. Br. 20-21. But that is not what the Settlement Agreement says. By releasing "*the City and* this parkland and residual land," ER371 (emphasis added), the 1984 Settlement Agreement makes clear that the release was not limited to a single parcel of land but released the City as a whole from the obligations in the Instrument of Transfer.

The release of the City as a whole from the Instrument of Transfer was intentional and consistent with the overall 1984 Settlement Agreement. That Settlement Agreement allowed the City to make substantial alterations to the Airport's operations and boundaries and created a new, integrated framework for the operation of the redesigned Airport through 2015. To that end, the Settlement Agreement expressly "resolve[d] all existing legal disputes among the parties" (ER369) and released the City "from any and all conditions, covenants, and restrictions imposed by the Instrument of Transfer." ER371. It replaced those

obligations with a new 30-year obligation to operate the redesigned Airport, but only until July 1, 2015.  ER371-ER373.

Amici AOPA argues that the Settlement Agreement did not release the City from the Instrument of Transfer because there was no existing legal dispute about whether the Instrument of Transfer's obligations were still in force.  AOPA Br. 14-15.  But the Settlement Agreement expressly resolved pending administrative complaints that were filed at least partly in response to the June 1981 resolution that the City Council adopted, declaring its intention to close the Airport.  ER293; ER369-ER370; *see also* AOPA Br. 12 (quoting AOPA Br. Ex. B at 337) (discussing then-existing controversy about whether the Instrument of Transfer's obligations were enforceable).  Moreover, the Settlement Agreement allowed the City to pursue "modify[ing] the existing runway" and to impose substantial noise-mitigation restrictions on Airport use (ER375-ER376, ER378-ER387), which might otherwise have been construed as violating obligations in the Instrument of Transfer.

The United States asserts that "the 1984 Settlement Agreement had a limited duration and did not address the rights and obligations of the parties after 2015." U.S. Br. 22.  The United States seems to suggest that it may have released the City from the Instrument of Transfer for 30 years but that thereafter the Instrument of Transfer becomes effective again.  Not only is that newfound interpretation

23

inconsistent with the express language of the Instrument of Transfer (ER373), it is irreconcilable with what the FAA Director determined in 1998. The Director explicitly stated that the 1984 "Settlement Agreement makes clear that the City is obligated to operate the Airport only for the duration of the [1984] Agreement (through July 1, 2015)." ER294. To the extent others "seek to prevent the future closure of the Airport or require the City to operate the Airport beyond July 1, 2015, that is a *local land use matter*." ER294-ER295 (emphasis added).

In any event, what matters for statute-of-limitations purposes is not how the United States interprets the 1984 Settlement Agreement *now* but whether the United States' actions *in the past* gave the City "reason to believe the government did not continue to claim an interest." *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1200 (9th Cir. 2008); *see Shultz*, 886 F.2d at 1161 (same). The FAA Director did not say that after July 1, 2015, the Instrument of Transfer would govern; he stated that use of the Airport would be a matter left to the City. ER294-ER295.

The United States argues that "the Director's Determination did not consider the Instrument of Transfer." U.S. Br. 21. But as the City explained (City Br. 55), the Director's Determination was interpreting the 1984 Settlement Agreement (ER13), and the Settlement Agreement released the City from its obligations under the Instrument of Transfer. ER371. Under *Michel*, that constitutes abandonment.

65 F.3d at 133 ("By expressly incorporating the 1970 letter recognizing the Michels' 'historic right of access,' the 1984 agreement could be construed as an abandonment of the government's claim that it had the exclusive right to control access."). The United States does not even try to address *Michel*.

The United States also asserts that the Director's Determination "was an initial determination that was subject to further administrative review." U.S. Br. 21. To be sure, informal statements by low-level employees cannot abandon an official claim of the United States. *Kingman Reef*, 541 F.3d at 1201. But the Director's Determination was an official decision by a senior agency official. ER294. Moreover, upon further administrative review, the FAA's Acting Associate Administrator for Airports *affirmed* the Director's Determination and reiterated that the Airport is to be "'administered by the City . . . until July 1, 2015.'" ER6 (quoting *Santa Monica Aiprort Ass'n v. City of Santa Monica*, No. 16-99-21, 2003 WL 1963858, at *3 (FAA Feb. 4, 2003)).

The United States also argues that "the Director did not have authority to release the City from its obligations under the Instrument of Transfer." U.S. Br. 22-23. But it was not the Director who released the City; it was the 1984 Settlement Agreement. The Director's Determination confirmed the City's reading of the Settlement Agreement and gave the City further "reason to believe the government did not continue to claim an interest." *Shultz*, 886 F.2d at 1161. That

25

is enough to constitute abandonment of a claim for statute-of-limitations purposes.

*Id.*

## C.  Whether The City's Quiet Title Act Claim Is Time Barred Depends On Factual Issues Going To The Merits

In any event, the United States cannot plausibly contend that the merits of the City's Quiet Title Act claim and the statute-of-limitations issue are not intertwined.  If the City's interpretation of either the Instrument of Transfer or the 1984 Settlement Agreement is correct, that means not only that the City will prevail on the merits of its Quiet Title Act claim but also that the City did not have the requisite notice sufficient to start (or restart) the limitations period until 2008. City Br. 56-58.  Because the factual disputes concerning whether the City had notice of the United States' claim "go to the heart of" the merits of the City's Quiet Title Act claim, it was erroneous for the district court to dismiss on jurisdictional grounds.  *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir. 1983).

The United States restates the legal principle that the "'crucial issue in the statute of limitations inquiry is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid.'"  U.S. Br. 23 (quoting *Kingman Reef*, 541 F.3d at 1197).  That principle simply means that on the particular facts of certain cases, the notice issue is so clear that a Quiet Title Act claim may be dismissed as time barred without considering any factual issues going to the merits.  *Kingman Reef*, 541 F.3d at 1197 ("[T]he question whether *this action* was timely was not

26

inextricably intertwined with the ultimate merits . . . ." (emphasis added)). But where, as here, the notice and merits questions are intertwined, dismissal without resolving the merits question is reversible error. *Augustine*, 704 F.2d at 1079.

The United States also points to the Supreme Court's statement that "'[i]f a claimant has title to a disputed tract of land, he retains title even if his suit to quiet his title is deemed time-barred.'" U.S. Br. 23 (quoting *Block v. North Dakota*, 461 U.S. 273, 291 (1983)). That statement is true enough. But it does not address the situation here, namely, where the timeliness and merits questions are so intertwined that the jurisdictional issue should not be resolved without adjudicating the merits.

In short, the inherently intertwined nature of the notice and merits questions—including whether the United States abandoned its prior position only to assert a novel one more recently—makes any decision about jurisdiction premature at best. Thus, at a minimum, the City should have been permitted to press ahead in the district court. The City should be given the opportunity to prove factually and legally that the United States' jurisdictional arguments lack merit and that the City's claim is meritorious.

## CONCLUSION

For the foregoing reasons and those in the City's opening brief, the order dismissing the City's Quiet Title Act claim should be reversed, and the case remanded for consideration of the merits of that claim.

Respectfully submitted,

s/ Deanne E. Maynard

MARSHA JONES MOUTRIE
  *City Attorney*
JOSEPH LAWRENCE
  *Assistant City Attorney*
LANCE S. GAMS
IVAN CAMPBELL
  *Deputy City Attorneys*
1685 Main Street, Room 310
Santa Monica, California 90401
Telephone: 310.458.8336

DEANNE E. MAYNARD
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., N.W.
Washington, D.C. 20006-1888
Telephone: 202.778.1663

DON G. RUSHING
JAMES W. HUSTON
WILLIAM V. O'CONNOR, JR.
JOANNA L. SIMON
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California 92130
Telephone: 858.720.5100

*Counsel for Plaintiff-Appellant*
*City of Santa Monica*

MARCH 4, 2015

28

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 4, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: March 4, 2015                                    s/ Deanne E. Maynard
                                              _____

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it is 6,850 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2010 in 14-point Times New Roman font.

Dated: March 4, 2015                                   s/ Deanne E. Maynard

dc-785362